139 N.J. Super. 318 (1976)
353 A.2d 564
ROSEMARY M. KARL, PLAINTIFF,
v.
NEW YORK LIFE INSURANCE COMPANY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided February 11, 1976.
*320 Mr. Myron J. Bromberg for plaintiff (Messrs. Porzio, Bromberg & Newman, attorneys; Mr. Donald B. Heeb on the brief).
Mr. Eugene M. Haring for defendant (Messrs. McCarter & English, attorneys; Mr. Haring, Mr. Robert A. White and Mr. Richard D. Quay, on the brief).
STANTON, J.C.C., Temporarily Assigned.
This is an action to recover under the accidental death benefit (double indemnity) provisions of two life insurance policies. Defendant insurance company has refused to pay these benefits on the ground that the insured died 11 months after the accident which allegedly caused his death, whereas the two policies in question provided that death must occur within 90 days or 120 days of the accident for accidental death benefits to be payable.
There is no reported New Jersey decision in point. The rule in almost every jurisdiction which has considered the question is that the time limitations set forth in the policy are controlling and that recovery must be denied in a case such as the present one. See Appleman, Insurance Law and Practice (2d ed. 1963), § 612. However, a recent decision by the Supreme Court of Pennsylvania has held that such time limitations are unenforceable and has allowed recovery where death by accident occurred well after the period stipulated in the policy. Burne v. Franklin Life Ins. Co., 451 *321 Pa. 218, 301 A.2d 799 (Sup. Ct. 1973). Although it is presently very much a minority rule, I am persuaded that the rule announced in Burne is the better rule and should be followed. Accordingly, there will be a recovery by plaintiff in this case.
Edward J. Karl suffered severe brain and skull injuries in a criminal assault made upon him in Madison, New Jersey, on January 6, 1969. Without ever having regained anything remotely approaching normal physical or mental functioning, he died in Morristown Memorial Hospital, Morristown, New Jersey on December 6, 1969. At the time of his death Karl was covered by two life insurance policies issued by defendant New York Life Insurance Company which contained accidental death benefits in addition to ordinary death benefits. One of the policies had been issued in 1955, the other in 1963. The insured's wife, plaintiff Rosemary M. Karl, was the beneficiary under each policy. Defendant insurance company has paid the $10,000 face amount of each policy to the beneficiary, but has refused to pay the accidental death benefit. Its refusal is based primarily upon the time limitation for the period between date of accident and date of death in each policy. The limitation is 90 days for the 1955 policy and 120 days for the 1963 policy. The refusal to pay is also grounded upon a secondary factual argument that death was not caused solely by the accident but was also partially the result of an intervening lung infection.
The 1955 policy provided in pertinent part that
The Company will pay to the beneficiary * * * an additional amount (the Double Indemnity Benefit) equal to the face amount of this policy upon receipt of due proof that the Insured's death resulted directly, and independently of all other causes, from accidental bodily injury and that such death occurred within 90 days of such injury * * *.
The 1963 policy provided in pertinent part that
* * * the Company will pay the Accidental Death Benefit, as part of the policy's death benefit proceeds, upon due proof that the *322 Insured's death resulted directly, and independently of all other causes, from accidental bodily injury and that such death occurred within 120 days after such injury * * *.
The insured suffered severe brain and skull injuries when he was criminally assaulted in the early evening of January 6, 1969. He was admitted promptly to Morristown Memorial Hospital. Within hours after his admission to the hospital, he underwent drastic brain surgery. Four additional surgical procedures were performed on the insured between the date of his admission and April 22, 1969. Karl remained in Morristown Memorial Hospital until June 13, 1969, when he was transferred to the Morristown Rehabilitation Center, a nursing home. He remained at the Rehabilitation Center until August 13, when he was readmitted to Morristown Memorial Hospital. He died in the Hospital on December 6, 1969.
From the date of the accident to the date of his death Karl was totally paralyzed, except that he occasionally was able to squeeze with one hand in response to command or by way of primitive communication. A tracheotomy was necessary to permit breathing. The insured never was able to speak. He could never feed himself and, indeed, could never eat anything approaching a normal diet. So far as could be observed, the insured never achieved anything approaching full consciousness or normal intellectual functioning. The transfer of the insured from the hospital to the nursing home on June 13, 1969 did not indicate that the insured was headed towards recovery  it simply indicated that the insured was not in an immediate crisis situation, that his physiological functions had stabilized on a total nursing care but temporarily safe level, and that he had no immediate need of the full range of sophisticated life-supportive equipment and services of a modern hospital. He was at all times from the date of the accident until his death a desperately unwell man.
Throughout the period from the date of the accident until the date of death the insured's treating physician was Dr. *323 Henry R. Liss, a neurosurgeon with first-rate credentials and broad experience. Dr. Liss testified that, among other serious injuries, Karl was suffering from acute subdural hematoma immediately following his accident. He stated that in the course of 25 years of practice he had treated perhaps 500 patients who had acute subdural hematoma and that everyone of them had died relatively shortly after the incident giving rise to the acute subdural hematoma. Although the doctor indicated that medical literature stated that some persons with acute subdural hematoma survive, and he himself had lately seen a few such patients while observing experimental techniques in a teaching hospital, he testified that he never expected Karl to survive his injuries and that, indeed, he was surprised that the patient lived as long as he did. Dr. Liss testified that the insured died as the direct and inevitable result of the injuries sustained during the assault upon him on January 6, 1969. He stated that during the course of his treatment the patient's condition had been complicated from time to time by various infections, but he noted that such infections were the normal and predictable consequence of the breakdown of various bodily functions which invariably follows massive brain injury.
Because Karl's death involved a criminal homicide, an autopsy was performed by the deputy county medical examiner. The death certificate issued by that official listed the cause of death as:
Immediate Cause (a) Intracranial pressure Due to (b) Subdural hematoma Due to (c) Trauma.
A more detailed report issued by the deputy county medical examiner on December 7, 1969 contained the conclusion:
CAUSE OF DEATH: Cerebral anoxia and cortical necrosis. Status postoperative, repair of subdural hematoma, partial right temporal lobectomy and tube drainage for hydrocephalus, traumatic. Atelectasis and emphysema of lungs.
*324 Dr. Howard E. Medinets testified on behalf of defendant with respect to the cause of death. Dr. Medinets is a neurosurgeon of impressive background. Although not disputing the massive influence of the original trauma on the ultimate death, he stated that, in his opinion, Karl had not died of brain damage alone. He believed that the immediate cause of death was lung infection which was to some extent independent of, and not a necessary result of, the brain damage. He also believed that a lung ailment suffered by Karl some years previous to the accident might have had some slight impact upon the ultimate course of events. It should be noted that Dr. Medinets had never treated or observed the patient. His opinion was based upon a review and study of Karl's medical records.
Having reviewed the medical testimony in this case, I am satisfied that it has been clearly and convincingly established that Karl died on December 6, 1969 as the direct result, independently of all other causes, from accidental bodily injury received by him on January 6, 1969. I am equally satisfied that the infection existing at the time of Karl's death was a normal part of the pathology resulting from the massive traumatic brain damage and does not amount in any legally significant sense to an independent cause of death. Hence, there has been an accidental death within the meaning of both policies upon Mr. Karl's life.
We turn now to the time limitations upon recovery for accidental death imposed by the policies. As a matter of fair linguistic analysis, there is no ambiguity about the time limitations imposed by these policies. The clear, unequivocal thrust of the language in both policies is to exclude coverage where death does not occur either 90 days or 120 days after the date of accident. Read in a literal and straightforward way, the policies would exclude recovery in this case.
The vast majority of courts construing time limitations such as the ones contained in the present policies have enforced *325 the policies as written and have denied recovery where death did not occur within the time period set forth in the policy. See Appleman, op. cit. § 612. They have done so because such a result is clearly called for by the language of the applicable policy, and because, as a matter of basic legal philosophy, there is a great deal to be said for giving straightforward effect to clear contractual language. Nevertheless, the fair application and development of law is more than a matter of good linguistic analysis, and a legal result should not be accepted merely because it is called for by contractual language. This fundamental proposition was recognized by the Pennsylvania Supreme Court in Burne v. Franklin Life Ins. Co., supra.
In Burne the court held that time limitations such as these are unenforceable because they violate public policy in that they introduce into the agonizing, difficult and delicate deliberations of the treating physicians and family of a mortally injured person a potentially sinister economic factor suggesting non-treatment. The problem is that as the patient's life is prolonged by treatment, insurance death benefits to his family may be decreased. Although there may be many cases where simple love for the patient and the underlying medical realities and expectations may suggest that certain forms of treatment not be undertaken, or that they be abandoned at some point after they have been started, this most difficult of human decisions should not be influenced by the crass thought that death benefits will be reduced if the patient lives beyond a certain number of days. This is the public policy foundation of the Pennsylvania Supreme Court's decision.
The court also noted in Burne that the time limitations in policies such as the one before us were developed in an age when medicine was much less advanced than it is today and when causation was much less traceable than it is today. Also, the development of these time conditions predated the present ability of medicine to prolong life. The Pennsylvania *326 court viewed the purpose of this time condition as being the elimination of doubt as to the cause of death. Where the cause of death is clear, there is no reason for the condition, and the condition should simply be dropped from the policy. As the court said:
Under the life insurance contract the specific hazard indemnified is premature death resulting from an accident. Recovery for that loss should not be forfeited by the arbitrary and unreasonable condition that payment will be made only if the accident victim dies within ninety days but not if he survives beyond that point. On this record it is obvious that to enforce the ninety day condition would serve only "as a trap to the assured or as a means of escape for the company in case of loss." [451 Pa. at 226, 301 A.2d 799 at 803]
I am persuaded that the public policy position of the Pennsylvania court in Burne is sound. I also believe that in a case such as the present one where the cause of death is clear, the enforcement of a 90-day or 120-day time limitation would be arbitrary and unreasonable.
There is another, perhaps more basic, reason for allowing recovery in this case. It is a reason which I have not seen enunciated in any decision dealing with the interpretation of an insurance policy, but it is a reason which underlies much of the judicial approach to the whole problem of insurance coverage. That reason is founded upon the recognition of the enormous social utility of having losses covered by insurance. Because of the enormous social utility of insurance coverage, whenever there is a reasonable dispute as to the existence of insurance coverage, the court should find coverage if the terms of the policy (read broadly in light of the general social and economic factors surrounding the policy) afford any fair and reasonable basis for finding coverage. In short, as a matter of basic public policy, courts should find coverage wherever it is possible to do so on a fair basis. Such an approach would lead to the conclusion that time conditions contained in an insurance policy should be *327 read in terms of broad purpose and function in cases in which a literal reading would defeat coverage.
The broad purpose and function of the time limitations contained in the accidental death benefit provisions of the insurance policies in the present case is a sound one. It is to protect the company from having to pay where it is doubtful that the death was caused by an accident. The time limitations reflect the fact that, as a broad proposition, the longer the time interval between the accident and the death, the more likely it is that an intervening cause brought about the death, or at least contributed to it. Under the basic approach suggested above, the time condition should be treated as requiring clear and convincing proof of the cause of death whenever the time limitation is exceeded. This would give fair treatment to the need of the insurance company to be protected from paying claims where the cause of death is doubtful. On the other hand, a literal reading of the time limitation in cases in which there is no fair doubt about the cause of death would give unwarranted protection to the insurance company and would work an arbitrary forfeiture upon the insured or his beneficiary.
In the present case the cause of death is clear. Without any real doubt, Karl died of the injuries he received when he was assaulted. Hence, under the approach suggested above, the time limitations on accidental death recovery are not to be read literally and Karl's beneficiary will recover.
It should be noted that I am not suggesting that all time terms in an insurance policy are to be read in a broad functional sense. Surely, sometime terms must be read literally. For example, the time terms setting forth the period during which the policy is in force would almost always have to be read literally because any other reading of them would destroy any fair and reasonable basis for defining and limiting the period of coverage.
Counsel for defendant has noted that the cost of the accidental death benefit coverage afforded to Karl was very *328 modest in relation to the cost of the basic life insurance coverage afforded to him. In one policy the accidental death coverage cost $9.60 a year as opposed to $185.80 a year for basic life coverage in an equal amount. In the second policy the accidental death coverage cost $8.80 a year as opposed to $256.80 for basic life coverage in equal amount. The argument is made that the charge for the accidental death coverage is so modest because it is meant to be very limited in scope. Counsel suggests that, if we ignore the time limitations on the accidental death coverage, we do unfair violence to the economic calculations of the insurance company.
Counsel's argument fails on two grounds. In the first place, in its answers to interrogatories the defendant says:
Defendant does not contend that the accidental death premium was calculated upon the time periods set forth in the accidental death benefits provisions of the policies insuring Mr. Karl. There is no relationship between the premium for the accidental death benefits and the time limitations set forth therein. The purpose of said time limitations is to minimize disputes with policy owners over claims where death occurs an unreasonably long time after an accident.
In the second place, a glance at the basic statistics on the causes of death indicates that the meaningful factor is the cause of death and not the time of death. For example, according to the 1970 New York Times Encyclopedic Almanac, United States Public Health Service figures for 1967 (the closest year to the year of Karl's death for which I happen to have information at hand) indicate that only 6.17% of the deaths occurring in the United States resulted from accident. The fact that relatively few deaths result from accident is what makes the cost of accidental death coverage so low. The time interval between the accident and the resulting death simply does not mean much from a basic risk point of view.
There will be judgment for the plaintiff in the amount of $20,000, plus interest at the simple rate of 6% a year *329 from the date the claim for accidental death benefits was presented to the defendant, plus costs. Pursuant to R. 4:42-9(a)(b) a reasonable counsel fee, plus disbursements, will be allowed to plaintiff's counsel. The amount of the fee will be fixed on motion.